# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIC C. RAJALA,

     *Plaintiff,*

vs.

                                       Case No. 09-2482

ROBERT H. GARDNER, *et al.*,

     *Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Eric C. Rajala, the Trustee for the bankruptcy estate of Generation Resources Holding Company, LLC ("GRHC"), brought this suit against six individual defendants and numerous corporate entities. The case has been proceeding for several years, and the parties have been before the Court numerous times on numerous issues. Several parties are again before this Court. The remaining Defendants[1] seek summary judgment on the claims remaining against them. Plaintiff also filed a motion for partial summary judgment under 11 U.S.C. § 544. In addition, Plaintiff filed a Motion to Enforce Rule 26(e). The Court will address each motion.

---

[1] These Defendants include: Robert H. Gardner; Robbin M. Gardner; Gardner Family Investment Company, LLC; William Stevens; Akiko Stevens; Stevens Family Investment Company, LLC; R. James Ansell; Virginia Z. Ansell; Windforce Holdings, Inc.; Lookout WindPower Holding Company, LLC; Lookout Windpower Holding Company, LLC (MO); Forward WindPower Holding Company, LLC; and Forward WindPower Holding Company, LLC (MO).

# I.  Factual and Procedural Background

## A.  Local Rules for Summary Judgment

The Court must initially set forth the required rules for summary judgment motions in the District of Kansas.  They are articulated in D. Kan. Rule 56.1.  Under that rule, "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[2]  D. Kan. Rule 56.1(b) addresses a party's responsibility in opposing a motion for summary judgment.

> (1) A memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed.

> (2) If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. All material facts set forth in this statement of the non-moving party will be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.

"[I]t is the duty of the parties contesting a motion for summary judgment to direct the court to those places in the record where evidence exists to support their positions."[3]  The Court will not sift through the record in an attempt to find a genuine issue of material fact or locate

---

[2] D. Kan. Rule 56.1(a).

[3] *Boldridge v. Tyson Foods, Inc.*, 2007 WL 1299197, at *2 (D. Kan. May 2, 2007) (citing *Caffree v. Lundahl*, 143 F. App'x 102, 106 (10th Cir. 2005) and *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513-14 (10th Cir. 1990)).

arguments for the parties.[4]  In addition, it is the party's responsibility to tie the facts to its legal contention.[5]  "Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.' "[6]

In this case, Defendants set forth 180 facts in support of their Motion for Summary Judgment.  The Trustee disputes, or "objects" to, 115 of these facts.  In most cases, however, the Trustee fails to cite to the record or to provide any evidence when disputing or objecting to Defendants' proposed facts.  In addition, when the Trustee does cite to evidence in an attempt to controvert a fact, he does not "refer with particularity" to the record for his proposition.  Instead, in one instance, he refers the Court to a 151-page deposition.  As noted above, the Court will not search the record to determine if the evidence does indeed exist to support his contention.  Thus, despite the Trustee's objections, the Court deems admitted most of Defendants' facts and will set forth those facts below. At times, however, Defendants do not adequately support their facts by the record.  The Court will disregard those facts.

With respect to the Trustee's Partial Motion for Summary Judgment, the Trustee frequently fails to cite to the record or direct the Court to the evidence that would allegedly support his contention.  In addition, when the Trustee does cite to the record, the evidence does not support his contention.  Finally, in certain instances, the Trustee fails to provide the Court

---

[4] *Boldridge*, 2007 WL 1299197, at *2.  *See also Cross v. The Home Depot*, 390 F.3d 1281, 1291 (10th Cir. 2004).

[5] *Boldridge*, 2007 WL 1299197, at *2 (citation omitted).

[6] *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (citations omitted).

with the document or evidence supporting his alleged fact. With the above rules in mind, the Court will set forth the uncontroverted facts.

**B. Facts**

Individual Defendants James Ansell and William Stevens have been involved in wind energy projects for a number of years. From 2000 through 2005, Ansell chaired the General Public Utilities for the Commonwealth of Pennsylvania Sustainable Energy Fund advisory board ("GPU Board"), which was comprised of seven individuals who reviewed sustainable energy projects or opportunities that were recommended by the executive directors of the Foundations.[7]

In 1999, Black & Veatch hired Stevens to work in its treasury department. In 2000, Black & Veatch hired Ansell as Director of Strategic Initiatives for its energy services division ("B&V Energy Services Division"). Stevens eventually worked with Ansell to evaluate internal Black & Veatch projects for the B&V Energy Services Division. Also, in 2000, Black & Veatch hired individual Defendant Robert Gardner as a senior attorney, and he worked with B&V Energy Services Division.

In early 2002, Ansell, Stevens, and Gardner presented Black & Veatch with the opportunity to develop wind farm projects in Pennsylvania, which Black & Veatch declined. Although Black & Veatch declined to develop wind farm projects, the B&V Energy Services Division agreed to expend a certain amount of money and resources in the form of engineering services to allow Ansell, Stevens, and Gardner to develop wind farm projects in Pennsylvania.

---

[7] The "Foundations" encompasses both the Berks County Community Foundation and the Community Foundation of the Alleghenies.

On February 2, 2002, the individual Defendants[8] formed GRHC as a Delaware limited liability company, to develop, own, and/or operate renewable resource generation assets in the event Black & Veatch decided not to develop wind farms.

### *The First Windpower Project - Stonycreek*

On March 18, 2002, the individual Defendants formed SW[9] to enter into leases with respect to a project, entitled the Stonycreek Project, and to be the project company for the Stonycreek Project. At the time of SW's formation, GRHC held a ninety-seven percent interest in SW and the individual Defendants held a one percent interest per couple. Prior to entering into the Edison Definitive Agreements,[10] GRHC became the sole member of SW. SW was and always has been a subsidiary of GRHC.

In February 2002, GRHC applied to the Foundations[11] for a $1 million loan to build a wind farm project. Defendants designate this project as the "Stonycreek Project." The application and loan documents do not designate a specific name for the project. GRHC's application to the Berks County Community Foundation defines the "Opportunity Description" as "Provide $1,000,000.00 ($500,000 from each fund) for the on-going development of economically viable projects in Eastern and Western Pennsylvania . . . ." It also states in the "Project Description" section that "the activity or 'project' to be undertaken by GRH[C] for the

---

[8] The individual Defendants are Mr. Ansell and his wife, Mr. Stevens and his wife, and Mr. Gardner and his wife. It appears that only Mr. Ansell, Mr. Stevens, and Mr. Gardner were involved in the business.

[9] The Court presumes that SW stands for Stonycreek Windpower; however, Defendants do not specifically state this proposition.

[10] The Edison Definitive Agreements, entered into on February 3, 2006, will be discussed in more detail below.

[11] Again, the "Foundations" encompasses both the Berks County Community Foundation and the Community Foundation of the Alleghenies.

purpose of this application is the development of one or more renewable energy projects within the Commonwealth of Pennsylvania." GRHC's application states that "these funds will be used to finance, on an 'at-risk' basis, GRH[C]'s development activities. The loaned funds to GRH[C] will be repaid upon securing construction financing of the first project."

When the Foundations presented GRHC's request to the GPU Board, Ansell recused himself from any discussion or vote. The Foundations agreed to loan GRHC the sum of $1 million, on an unsecured basis. On April 19, 2002, the parties entered into a Commitment Letter and Promissory Note.

The Commitment Letter states

The Loan will be used at the reasonable discretion of the Borrower to pay the associated costs and expenses of pursuing and developing financially viable wind-generated power projects in the Commonwealth of Pennsylvania (the "Project"). The Project is more particularly described in the Borrower's written application to [Berks County Community Foundation.]

The maturity date of this loan was April 18, 2004.

### *The Second Windpower Project - Forward*

In July 2002, GRHC applied to the Foundations for a second $1 million loan. Defendants designate this project as the "Forward 1 Project."[12] GRHC's application defines the

---

[12] Defendants contend that there was a "Forward 1 Project" and a "Forward 2 Project," and that this loan request was for the Forward 1 Project. The Trustee contends that there is only one Forward Project. There are numerous questions surrounding the Forward Project because the evidence is not clear.

The Court notes several inconsistencies with Defendants' assertions with respect to the Forward Project. All of the documents relating to Forward only reference the "Forward Project." There is never a designation relating to Forward 1 or Forward 2 Project. Defendant Stevens claims that GRHC abandoned the "Forward 1 Project" in early 2004 because GRHC determined that there was not a viable wind resource in that location, and GRHC then moved on to the "Forward 2 Project." The Court notes that Defendants received their first loan extension for the "Forward 1 Project" in April 2004—around the same time GRHC apparently determined that the project was not viable and moved on to the "Forward 2 Project." Furthermore, GRHC requested a second loan extension from the Foundations in September 2005. This loan extension related to the previous two $1 million loans (one loan allegedly for Stonycreek, and one loan allegedly for the Forward 1 Project). If GRHC believed that the "Forward 1 Project" was not viable in 2004 (and was unrelated to the "Forward 2 Project"), the Court questions why Defendants requested a loan extension (and made representations that they were still planning on repaying the $1 million loan)

"Opportunity Description" as "funding for the on-going development of economically viable renewable energy projects in the Commonwealth of Pennsylvania . . . ." The "project description" states that the purpose of this application is "the development of up to a 45 megawatt ("MW") renewable energy project located between Hooversville and Central City, in Somerset County, PA. Preliminary turbine placements are being sited along ridgelines with interconnecting lines following local roads surrounding the village of Forward." It also provides that GRHC is seeking funds for the Forward Project.

The Foundations agreed to loan GRHC the sum of $1 million, on an unsecured basis. On October 17, 2002, the parties entered into a Commitment Letter and Promissory Note. The Commitment Letter states that the loan will be used to pay the costs of the "Project," as described in the application to the Foundations. The terms of this second loan were identical to the terms of the first loan, except that the maturity date for the second loan was October 17, 2004.

### The First Extension of the Foundations' $1 Million Loans

In October or November 2003, in anticipation of the upcoming maturity dates for the two $1 million dollar Foundations loans,[13] GRHC requested an approximate one-year extension of the maturity dates. On November 20, 2003, Michael Kane, President of the Community Foundations for the Alleghenies, requested a current statement of GRHC's financial condition, including a balance sheet and income statement prior to December 3, 2003. GRHC provided the Foundations with its compiled financial statement as of December 31, 2002, which was prepared

---

for the "Forward 1 Project" more than a year after determining that the "Forward 1 Project" was not viable. Thus, the Court will refer to the project as the Forward Project.

[13] The maturity dates were April 18, 2004 and October 17, 2004.

by its accountant, Gary Hawkins. The income statement contained a "salaries expense" of $321,000 listed under "expenses."[14]

On April 8, 2004, the Foundations extended the maturity date of the first loan from April 18, 2004 to December 18, 2005. The Foundations also extended the maturity date of the second loan from October 17, 2004 to December 17, 2005. All other terms of these loans remained the same.

### Ansell's, Stevens's, and Gardner's Salaries

After the Foundations made the two $1 million dollar loans in 2002, Ansell, Stevens, and Gardner discussed how to keep the projects going and how to pay back the Foundations' loans in the event one of them died or became incapacitated. GRHC decided to purchase $2 million of "key man" life insurance. Ansell, Stevens, and Gardner were told they did not meet income requirements to purchase this life insurance. Stevens, the lowest paid individual, needed to be paid an additional $100,000 per year to qualify for the "key man" life insurance. Ansell, Stevens, and Gardner decided that because each of them and their wives had a one-third interest in GRHC, and each of them was equally working on developing the projects, GRHC would pay Ansell, Stevens, and Gardner approximately $100,000 per year.

In or around October 2002, GRHC paid Ansell, Stevens, and Gardner salary in the amount of $107,000 per person, totaling $321,000. In or around October 2003, GRHC paid Ansell, Stevens, and Gardner salary in the same amount per person. In or around February 2004,

---

[14] This financial statement indicated that GRHC's "Net Income" was ($395,966.80).

GRHC paid Ansell, Stevens, and Gardner salary in the amount of $115,000 per person, totaling $345,000.[15]

### The $330,000 Loan from Berks County Community Foundation (Third Loan)

On August 26, 2004, the individual Defendants formed Forward Windpower, LLC ("FW"), a Delaware limited liability company.[16] Defendants applied for additional funding from the Foundations.[17] The Community Foundation for the Alleghenies declined FW's request. Berks County Community Foundation agreed to lend FW $330,000 on November 11, 2004.[18] Although the Foundations' Loans made to GRHC in April and October 2002 are cross-defaulted with each other, the Berks County Community Foundation loan of November 11, 2004 is not cross-defaulted with the previous two loans.

### The Third Windpower Project - Lookout

Between June and December 2004, Reed Miller, a property owner near the town of Berlin, Pennsylvania, approached Ansell about whether Ansell, Stevens, and Gardner would be interested in developing a wind farm project on his property. Miller also mentioned that his

---

[15] The Trustee contends that the approximate $1 million in salary (over three years) came from the money GRHC received from the Foundations. Defendants contend that this contention is unsupported. But, Stevens and Gardner both appear to testify in their depositions that GRHC used some of the Foundations' loan proceeds for their salary expenses.

[16] Defendants contend that they formed this company to develop the "Forward 2 Project," which was located on the same ridge line as the "Forward 1 Project," but about two miles to the south. As noted above, there are numerous questions surrounding the Forward Project.

[17] Defendants contend that this additional funding was in relation to the "Forward 2 Project." In requesting this additional funding, however, Defendants used an application that they had previously filled out which related to the "Forward 1 Project." In addition, Richard Mappin, Vice-President for Grant Making for the Berks County Community Foundation, testified that the $330,000 was additional funding for the Forward Project.

[18] This Promissory Note states that the maturity date for this loan was December 17, 2005. Neither party gives specific facts with respect to the extension of this loan. However, a letter from the Foundations, dated January 6, 2006, indicates that the Foundations extended the maturity date for this loan when they granted a second extension for the maturity dates of the first two $1 million loans.

neighbors might be interested. On December 15, 2004, Lookout Windpower, LLC ("LW")[19] entered into three leases to develop the "Lookout Project" with Miller's neighbors. LW entered into a lease with Miller on January 5, 2005.

LW waited to file its formal organization papers until it determined whether the Lookout Project was viable. On April 28, 2005, the individual Defendants formed LW, a Delaware limited liability company. Subsequent to LW's formation, it entered into five more leases. LW borrowed money from FW to fund the development of the Lookout Project prior to February 3, 2006. GRHC had previously purchased met towers and anemometry equipment to collect wind data for their prior projects, and two of those met towers were moved to the Lookout Project to collect wind data after being refitted with all new anemometry equipment purchased by LW.

### The Edison Transaction and the Second Extension of the Foundations' $ 1 Million Loans

FreeStream Capital, LLC ("FreeStream") provides advisory services for, among other things, wind development projects. Lee Garner is an owner of FreeStream. In 2004-2005, GRHC began looking for investors for the Stonycreek Project, but was unsuccessful.

During this same time period, Stevens and Garner began discussions about how FreeStream and GRHC might be able to do business together with regard to the Stonycreek Project. On February 28, 2005, FreeStream and GRHC entered into a financial advisory services agreement with respect to the Stonycreek Project. At this time, the Stonycreek Project was the only project capable of being sold and built.

Once the financial advisory services agreement was fully executed, Garner informed GRHC that Edison was a potential buyer for the Stonycreek Project. GRHC had previously tried

---

[19] LW was not formally registered as a limited liability company until April 2005.

to engage Edison for the Stonycreek Project, but those efforts were unsuccessful. In their discussions with Edison, FreeStream, as well as Ansell, Stevens, and Gardner, learned that Edison was interested in potential transactions related to their other projects.[20]

On February 28, 2005, FreeStream and FW entered into a financial advisory services agreement. On April 15, 2005, FreeStream and LW entered into a financial advisory services agreement.[21]

In June 2005, GRHC kept the Foundations apprised of their negotiations with Edison regarding the sale of the windpower projects and sent the Foundations their "'near final' term sheet with Edison Capital." In a June 2005 email from Stevens to an individual with the Foundations, he stated that

> [O]nly one of the $1M loans was technically borrowed for Stonycreek (the other for Forward). But we still intend to repay the other $1M loan (plus P&I) from additional funds (= profit) not designated as 'sunk costs' in this term sheet. . . . If there is insufficient profit from Stonycreek to fully repay the second $1M SEF loan, which we are endeavouring not to let happen, it will be fully repaid from construction financing from Forward (under similar terms and conditions in this term sheet).

Edison, FreeStream, GRHC, FW, and LW negotiated a memorandum of understanding (the "MOU") to facilitate a transaction for the Stonycreek Project, the Lookout Project, and the Forward Project. In the draft MOU, GRHC was identified as "Developer." SW, FW, and LW were identified as affiliates of Developers, and the Stonycreek, Forward,[22] and Lookout Projects

---

[20] Defendants designate these projects as the Forward 2 Project and the Lookout Project. As noted above, the evidence as to whether there were two Forward projects is unclear.

[21] The Court notes that LW was not formally organized until April 28, 2005.

[22] There was no designation of a Forward 1 Project or Forward 2 Project; instead, the designation was to the Forward Project.

were specifically identified. At the time of the MOU, Edison was more enthusiastic about the Stonycreek Project than the other projects.

On June 22, 2005, Stevens provided the Foundations with a copy of the draft MOU, which the Foundations forwarded on to their attorneys. On June 29, 2005, the Foundations sent a letter to Randy Mann in which Edison stated their approval of the draft MOU they had received on June 22, 2005. On July 18, 2005, GRHC and Edison Capital signed the MOU. The parties involved in negotiating the MOU believed that it was a non-binding preliminary document.

On September 29, 2005,[23] GRHC sent a letter to the Foundations requesting that the maturity dates of the Foundations' Loans be extended to December 18, 2006. The letter references the Stonycreek and Forward Projects.[24] In this letter, Stevens (on behalf of GRHC, SW, and FW) made the representation that the Foundations' loans would be paid from the Forward Project if there were insufficient proceeds from the Stonycreek Project. The letter also stated that the Foundations' loans would be repaid prior to any profits being retained by GRHC's shareholders. There is no reference to the Lookout Project in this letter.

On October 27, 2005, Stevens provided a copy of the signed MOU to the Foundations' attorney, Anthony DiSandro. On November 18, 2005, DiSandro sent a letter to Stevens stating that the Foundations did not have enough information to extend the terms of the Foundations Loans.

---

[23] The Court notes that according to Defendants' facts, the Forward 1 Project had been abandoned at the time they requested a loan extension for the Forward 1 Project.

[24] The Court notes that this letter only references the Foundations' first two $1 million loans. This letter states that it would like to express its thanks to the Foundations for their continued support of both the Stonycreek WindPower and Forward WindPower Projects. There is no distinction between a Forward 1 Project or Forward 2 Project in this letter.

Before GRHC spoke with DiSandro again, the individual Defendants formed several different entities. On November 28, 2005, the individual Defendants formed Forward WindPower Holding Company, LLC ("FWHC"),[25] to which the individual Defendants transferred their respective ownership interests in FW. On this same date, the individual Defendants formed Lookout WindPower Holding Company, LLC ("LWHC"),[26] to which the individual Defendants transferred their respective ownership interests in LW. On November 29, 2005, both FWHC and LWHC passed resolutions to approve the execution, delivery, and performance by FW and LW of the drafts of the Edison Definitive Documents.[27] Sometime after November 28, 2005, the Gardners transferred their individual ownership in FWHC and LWHC to Gardner Family Investment Company, LLC; the Stevens transferred their individual ownership in FWHC and LWHC to Stevens Family Investment Company, LLC; and the Ansells transferred their individual ownership in FWHC and LWHC to WindForce Holdings, LLC.

On December 5, 2005, Stevens sent an email to DiSandro attaching drafts of the Edison Definitive Documents, indicating in his email that the documents primarily related to the Stonycreek Project. These documents included a Development Loan Agreement,[28] which identified the Borrower as Stonycreek WindPower, LLC, Forward WindPower, LLC, and Lookout WindPower, LLC, all as affiliates of GRHC. The Development Loan Agreement also identifies the leases for Stonycreek Project, Forward Project, and Lookout Project.

---

[25] This entity was formed in Pennsylvania. The individual Defendants also formed FWHC in Missouri

[26] This entity was formed in Pennsylvania. The individual Defendants also formed LWHC in Missouri.

[27] The Court notes that Defendants never fully define for the Court all of the documents that allegedly constitute the Edison Definitive Documents.

[28] Defendants only provide the Court with a copy of the Development Loan Agreement. The Court is unclear as to whether this is the only document that Defendants provided to DiSandro.

On December 12, 2005, DiSandro emailed Stevens indicating that he had reviewed the documents emailed to him and asked about the status of the final documents.[29]  On December 16, 2005, Stevens emailed DiSandro revised drafts of the Edison Definitive Documents, including the Forward Development Agreement.  In the redline version of the Forward Development Agreement, GRHC was removed as the "Developer" and was replaced with FWHC.  FW's Amended and Restated Operating Agreement also named FWHC as the Developer, instead of GRHC.

On December 30, 2005, DiSandro sent Stevens a letter outlining the terms under which the Foundations would extend the maturity dates of the Foundations' loans, which included GRHC, SW, FW, and FWHC signing cross-guaranties, plus giving the Foundations a second-priority security interest in all of the assets of the same.  In this letter, the Foundations do not reference LW or LWHC.

The Foundations sent another letter (the "Letter Agreement") on January 5, 2006.[30]  The Letter Agreement no longer required security interests and cross-guaranties.  DiSandro, Stevens, and Gardner exchanged several additional emails in an attempt to finalize the extension of the Foundation Loans.[31]  Stevens also sent an email with a loan extension confirmation acceptable to Edison.  The next day, January 6, 2006, DiSandro sent an email to Stevens, Gardner, and Ansell

---

[29] Defendants assert that DiSandro's December 12, 2005 email did not ask any questions about the Forward Project, but he requested copies of the agreements for the other project companies (which would include Forward and Lookout).  On December 16, 2005, Stevens provided him with copies of documents related to the Forward Project, including a copy of the Forward Operating and Development Agreement.

[30] Defendants contend that the Foundations sent this letter because Defendants refused to consent to the terms outlined in the Foundations' December 30, 2005, letter.

[31] In reviewing these emails, it appears that Gardner and Stevens would not agree to the Foundations' terms for extension of the loans.  In addition, a January 5, 2006, email from Gardner to DiSandro indicated that Gardner needed to provide Edison with proof (that day) that the Foundations would extend the loans in order to enter the transaction with Edison.

returning the fully-executed loan extension confirmation. The loan extension confirmation stated that GRHC and FW represented to the Foundations that they would not be able to repay their loans unless they entered into an arrangement with Edison in which Edison may provide certain financing for the further development of the projects. Those projects were defined as the Stonycreek Project and the Forward Project. The Foundations agreed to extend the maturity dates of the Foundations' loans, in the principal amount of $2,330,000,[32] to December 31, 2007.

On February 3, 2006, the Edison Definitive Documents were signed by the parties.[33] Upon closing, Edison was 50 percent owner of LW and FW, with the remaining 50 percent owned by LWHC and FWHC, respectively.[34] The SW, FW, and LW Development agreements contained the following integration clause:

> The Agreement constitutes the entire agreement between the parties relating to the transaction described herein and supersedes any and all prior oral or written understandings, including the Memorandum of Understanding dated as of July 18, 2005.

On March 28, 2007, Mission Wind Pennsylvania, an Edison entity, and FWHC entered into a Redemption Agreement with respect to the Forward project.[35] Pursuant to this Agreement, the parties agreed to a redemption price of $1,493,000. In addition, pursuant to this Agreement,

---

[32] As noted above, neither party specifically discusses the extension of the maturity date of Berks County Community Foundation's $330,000 loan (the third loan). This "extension" document, however, indicates that Berks County Community Foundation extended the maturity date of this loan.

[33] Again, Defendants do not define for the Court all the documents that allegedly constitute the Edison Definitive Documents. The documents that Defendants rely upon for this fact include SW's, FW's, and LW's Development Agreements.

[34] No information is given on the ownership of SW.

[35] Defendants attempt to designate the project as "Forward 2." There is no designation in the documents as to Forward 2 Project, and it only states the Forward WindPower project.

FWHC withdrew as a member of FW.[36]  On March 30, 2007, the redemption price was paid as follows: $396,737 to FWHC, $242,000 to Berks County Community Foundation,[37] and $854,263 to FreeStream.

On March 28, 2007, Mission Wind Pennsylvania and LWHC entered into a Redemption Agreement with respect to the Lookout project.  Pursuant to this Agreement, the parties agreed to a redemption price not to exceed $11,507,000.  LWHC also withdrew as a member of LW, pursuant to this Agreement.[38]  On March 30, 2007, a portion of the Lookout redemption price was paid as follows: $750,000 to LWHC and $250,000 to FreeStream.  The balance of the Lookout redemption price was to be paid within five business days of when the Lookout Project achieved commercial operation, as defined in the Lookout Redemption Agreement.[39]

### GRHC's Bankruptcy and the Litigation Surrounding the Windpower Projects

On April 28, 2008, GRHC filed its voluntary petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Kansas.[40]  On August 13, 2008, Black & Veatch filed the Black & Veatch claim in the bankruptcy case in the amount of $2,200,000.[41]  On September 15, 2009, the Foundations filed the Foundations Claim

---

[36] Prior to the Redemption Agreement, FWHC and Mission Wind Pennsylvania were the members of FW.

[37] Defendants assert that this amount paid the "Forward 2" loan in full, but Defendants previously asserted that the "Forward 2" loan was in the amount of $330,000.

[38] Prior to the Redemption Agreement, LWHC and Mission Wind Pennsylvania were the members of LW.

[39] Defendants contend that Edison was still pursuing the Stonycreek Project after March 28, 2007, the date of the Forward and Lookout Redemption Agreements.  This fact, however, is not supported with competent evidence.

[40] This case is designated as Case No. 08-20957.

[41] This amount apparently relates to in-kind engineering services.

in the bankruptcy case in the amount of $2,827,054.94. No other creditors filed proofs of claim in the bankruptcy case.

On December 18, 2008, LWHC and FreeStream filed a complaint in the United States District Court for the Western District of Missouri seeking the balance of the Lookout redemption price, among other relief. On April 17, 2009, the Western District of Missouri dismissed the case for lack of jurisdiction. On the same date, LWHC and FreeStream filed a complaint in the United States District Court for the District of Pennsylvania (the "Pennsylvania Court") seeking the balance of the Lookout redemption price, among other relief. GRHC was not a party to either case.

On September 11, 2009, Eric Rajala, the Trustee of the bankruptcy estate of GRHC, filed this case in the District of Kansas against numerous Defendants. The Trustee filed his Second Amended Complaint on October 12, 2010, asserting eighteen claims, including fraud, fraudulent transfer, and breach of fiduciary duty claims.[42] Over the past several years, the parties have been before the Court on numerous issues. The Court will only briefly outline a few of those occasions.

In early May 2011, the Trustee filed a Motion for a Temporary Restraining Order, for a Preliminary Injunction, or alternatively, Order that Collateral Estoppel Does Not Apply in this Court. The Trustee requested that this Court stop a scheduled May 27, 2011, bench trial between LWHC, FreeStream, and Edison in the Pennsylvania Court. This Court denied the Trustee's motion.[43]

---

[42] Doc. 100.

[43] Doc. 129.

The Pennsylvania Court held its bench trial on May 27, 2011. On May 31, 2011, the Pennsylvania Court entered its Findings of Fact and Conclusions of Law and Judgment and its Memorandum and Order. The Pennsylvania Court entered judgment in favor of LWHC and FreeStream against Edison Mission Energy, in the amount of $8,991,448.46 (the "Pennsylvania Judgment"), with 75 percent of the judgment award in favor of LWHC and 25 percent in favor of FreeStream. The Pennsylvania Court transferred the issue of whether the Pennsylvania Judgment was property of GRHC's bankruptcy estate to the United States Bankruptcy Court for the District of Kansas.

On June 30, 2011, Edison deposited the Pennsylvania Judgment in the registry for the bankruptcy court. LWHC then filed a Motion to Withdraw the Reference from the bankruptcy court to this Court on the issue relating to the Pennsylvania Judgment funds, which created a miscellaneous case.[44] The bankruptcy court recommended that this Court withdraw the reference from the bankruptcy court. The Court adopted the bankruptcy court's recommendation,[45] and the miscellaneous case was converted to a civil case (Case No. 11-2524) and consolidated with the instant case.[46]

From July 2011 through December 2011, the parties filed numerous motions. LWHC and FreeStream filed motions seeking the Court's determination that the Pennsylvania Judgment Funds were not part of GRHC's estate property, and they sought distribution of those funds. This Court granted their motions finding that allegedly fraudulently transferred property is not

---

[44] Case No. 11-MC-226.

[45] Doc. 5 in Case No. 11-2524.

[46] Doc. 37 in Case No. 11-2524 and Doc. 193 in Case No. 09-2482.

part of the bankruptcy estate until it is recovered.[47]  On May 9, 2012, the funds were released and distributed to LWHC and FreeStream.  The Trustee appealed this Court's order to the Tenth Circuit Court of Appeals.  The Tenth Circuit recently affirmed this Court's determination.[48]

The Court has dismissed or granted summary judgment on numerous claims.[49]  In addition, several Defendants are no longer part of the case due to either the Court's previous summary judgment orders or because the Trustee filed a voluntary dismissal.[50]  Essentially, three claims remain:  (1) a breach of fiduciary duty claim against the individual Defendants, part of count 1;[51] (2) fraudulent transfer claims, counts 5 through 10; and (3) a civil conspiracy claim against the individual Defendants, count 12.[52]  The remaining Defendants move for summary judgment on all of these claims (Doc. 255).  Plaintiff also moves for partial summary judgment on and under 11 U.S.C. § 544 (Doc. 256) asserting that the Court should avoid the transfer of GRHC's interest in the Forward Windpower and Lookout Windpower projects and require Defendants to disgorge and return the Forward Windpower and Lookout Windpower sales price for a fair distribution under the Bankruptcy Code.  Plaintiff also has a Motion to Enforce Rule 26(e) (Doc. 274).

_____

[47] Doc. 217.

[48] *See Rajala v. Gardner*, 709 F.3d 1031 (10th Cir. 2013) (finding that allegedly fraudulently transferred property is not part of the bankruptcy estate until it is recovered).

[49] *See* Docs. 109, 217.

[50] *See* Doc. 217 (granting summary judgment in favor of Defendant FreeStream on all claims asserted against it).  *See also* Doc. 243 (Plaintiff's voluntary dismissal of six Defendants (Edison Mission Energy, Mission Wind Pennsylvania, Inc., Mission Wind Pennsylvania Two, Inc., Mission Wind Pennsylvania Three, Inc., Lookout Windpower, LLC, and Forward Windpower, LLC)).  Thirteen Defendants remain in the case, and they were set forth above in footnote 1.

[51] The Court previously dismissed part of the Trustee's breach of fiduciary duty claim based on the usurping of a corporate opportunity.  *See* Doc. 217.

[52] *See* Pretrial Order, Doc. 253, p. 2.

## II.     Summary Judgment Motions

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[53] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[54] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[55] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[56] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[57] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[58]

Though the parties in this case have filed cross-motions for summary judgment, the legal standard remains the same.[59] Each party retains the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[60] Each motion will be

---

[53] Fed. R. Civ. P. 56(a).

[54] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[55] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[56] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[57] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[58] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[59] *City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[60] *United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1381-82 (D. Kan. 1997) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir.1983)).

considered separately.[61]  "To the extent the cross-motions overlap, however, the court may address the legal arguments together."[62]

## A.  Defendants' Motion for Summary Judgment (Doc. 255)

### 1.  Fraudulent Transfer Claims (Counts 5 through 10)

The Trustee brings fraudulent transfer claims pursuant to K.S.A. § 33-201 *et seq*, the Kansas Uniform Fraudulent Transfer Act ("KUFTA").  As noted in a previous Order, the Trustee's fraudulent transfer claims are brought pursuant to the KUFTA, and he does not bring his claims pursuant to the Bankruptcy Code's fraudulent transfer provisions.[63]

#### *a.  Standing*

Defendants first contend that the Trustee does not have standing to pursue the fraudulent transfer claims.  A trustee in bankruptcy "must draw his authority to assert a particular cause of action from some provision within the [Bankruptcy Code.]"[64]  "Causes of action commenced by a trustee on behalf of a debtor estate fall into two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers [contained in 11 U.S.C. § 544]."[65]  There is a distinct difference when bringing a claim under either § 541 or § 544 of the Bankruptcy Code.  Under § 544, the cause of action belongs to the creditor, and the Trustee steps

---

[61] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[62] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

[63] Doc. 217.  The Court noted that neither party discussed the distinction between the KUFTA and the Bankruptcy Code in their previous briefing to the Court.  Doc. 217, p. 31, n. 93.

[64] *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996).

[65] *Id.* at 1304 (citing 2 Collier on Bankruptcy ¶ 323.02 [4], at 323-10).  "Because § 544 gives a trustee certain avoidance powers, actions brought under the section fall within the second category of types of trustee actions." *Id.*

into the creditor's shoes.[66]  In contrast, under § 541, the cause of action belongs to the debtor, and the Trustee steps into the debtor's shoes.[67]

In this case, the source of the Trustee's standing is not clear.  In response to Defendants' Motion for Summary Judgment, the Trustee contends that he is proceeding under either 11 U.S.C. § 544(a) or (b) with respect to his fraudulent transfer claims.  The Trustee has never previously relied upon § 544 as the basis for his authority to bring his claims.  In his Second Amended Complaint, the Trustee does not cite to § 544, but he does cite to § 541 once.[68]  He does not, however, cite to §541 as the basis for his standing now.  Because the Trustee only discusses § 544, and does not reference § 541,[69] the Court will only address § 544 when determining whether the Trustee has standing to pursue these fraudulent transfer claims.[70]

Section 544 contains two subsections: 544(a) and 544(b).  The Trustee attempts to invoke both provisions.  "Section 544(a) gives the trustee the power, as of the commencement of the bankruptcy case, to avoid transfers and obligations of the debtor to the same extent as certain

---

[66] *Id.* at 1304-05.

[67] *Id.* at 1305, n. 5 ("In this respect, sections 541 and 544(b) of the Bankruptcy Code are mirror images of one another.  When the trustee proceeds on a state claim under the former, the cause of action must belong to the debtor itself, but under the latter, the cause of action must belong to an actual creditor of the debtor.").

[68] With respect to his reference to § 541, it is contained in paragraph 39 of his Second Amended Complaint, in which the Trustee alleges that "[t]his Complaint arises out of, arises under, and relates to the Chapter 7 bankruptcy proceedings of GRHC now pending in the United States Bankruptcy Court for the District of Kansas, and is property of the bankruptcy estate under 11 U.S.C. § 541, and this Court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1334(b) and (d)."

[69] The Trustee does state that a fraudulent-transfer cause of action is considered property of the estate (which implicitly refers to § 541), but he never references or discusses his alleged authority to bring suit under § 541.  As noted above, the distinction between § 541 and §544 is important as it determines whether the Trustee steps into the shoes of the creditors or the debtor entity.

[70] The Court notes that it is unclear whether the Trustee must specifically reference his capacity to bring state law claims, under either § 541 or § 544, in the complaint.  *See Sender*, 84 F.3d at 1305 (addressing the trustee's standing and capacity to bring state law claims even though the complaint did not address the trustee's capacity).

hypothetical ideal creditors."[71]  These hypothetical creditors include (1) a judicial lien creditor, (2) a creditor holding an execution returned unsatisfied, and (3) a bona fide purchaser of real property.[72]  Although the Trustee attempts to invoke this provision, he does not assert that any hypothetical creditor was injured.  Instead, he simply states that a hypothetical creditor is enough.  The Court finds that § 544(a) is inapplicable to the facts in this case because the Trustee fails to articulate or demonstrate its applicability.

With respect to § 544(b), this provision allows the Trustee to pursue fraudulent transfer claims under state law.[73]  "Subsection (b) [of § 544] contains no substantive provisions indicating what transfers or obligations are avoidable.  The Trustee's powers under the section are predicated on the non-bankruptcy law, usually state law, applicable to the transaction sought to be avoided."[74]  Thus, the Court concludes that § 544(b) is the avenue that gives the Trustee the capacity to pursue his state fraudulent transfer claims.[75]

---

[71] *Sender*, 84 F.3d at 1304.

[72] *See* 11 U.S.C. § 544(a)(1)-(3).  "The purpose of the strong arm clause is to cut off unperfected security interests, secret liens and undisclosed prepetition claims against the debtor's property as of the commencement of the estate." 5 Collier on Bankruptcy, § 544.02[2], at 544-6.

[73] Section 544(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."  *See also* 5 Collier on Bankruptcy, 548.01(2)(a).  *See In re Hedged-Investment Assoc's, Inc.*, 84 F.3d 1281, 1285 n.6 (10th Cir. 1996) ("A trustee is empowered under 11 U.S.C. § 544(b) to 'avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim.'  This provision is typically invoked by trustees to pursue state law fraudulent transfer or conveyance claims.")).

[74] *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). *See also In Re IFS Financial Corp.*, 417 B.R. 419, 432-33 (Bankr. S.D. Tex 2009) ("Section 544(b)(1) allows a trustee to avoid transfers that a creditor could avoid under applicable state law.") (citations omitted).

[75] Although the Court finds that § 544(b) gives the Trustee the capacity to bring the KUFTA claims (without the Trustee specifically designating so in his Complaint), the Trustee did not bring a § 544(b) claim in the Complaint or Pretrial Order.  Thus, the Trustee must rely upon KUFTA and its provisions to avoid any alleged fraudulent transfers (within the parameters of the Bankruptcy Code).

When using § 544(b) as the provision to demonstrate standing, the burden is on the Trustee "to demonstrate the existence of an actual creditor with a viable cause of action against the debtor that is not time barred or otherwise invalid."[76] The parties appear to agree that there are three creditors that have filed proofs of claim in the bankruptcy case: Black & Veatch and the Foundations (which includes Berks County Community Foundation and the Community Foundation of the Alleghenies).[77] Defendants, however, argue that the uncontroverted facts demonstrate that these three creditors agreed to limit their recovery to the Stonycreek and Forward 1 Projects. Thus, Defendants contend that because the Trustee stands in the shoes of the creditors, and the creditors agreed to limit their recovery to these projects, the Trustee does not have standing to seek monetary recovery from FWHC (and the Forward 2 Project) or LWHC (and the Lookout Project).

The Court disagrees with Defendants' contention that these facts are uncontroverted. With respect to the Foundations' claim, Defendants argue that the Foundations knew that their loans were used for the development of the Stonycreek and "Forward 1" Projects. There are numerous questions of fact surrounding the Forward Project. One of those questions is whether there were in fact two Forward projects. Because it is unclear whether there were two Forward projects, the Court cannot conclusively determine that the Foundations limited their recovery to the Forward 1 Project. Thus, the Court cannot determine as a matter of law that the creditors lack standing to pursue these fraudulent transfer claims.

---

[76] *See* 5 Collier on Bankruptcy, 544.06.

[77] The Court notes that the existence of creditors is only briefly mentioned in the Complaint, and the parties only identify and discuss the creditors for the first time with respect to this Motion for Summary Judgment. These creditors' claims total $5,027,054.94.

### b. Fraudulent Transfer Prima Facie Case

Even though there are questions surrounding the Trustee's standing, the Court will address the Trustee's fraudulent transfer claims. Defendants argue that the Trustee cannot establish a fraudulent-transfer prima facie case because (1) the Trustee cannot establish that there was a transfer of GRHC's property, (2) there is no evidence of the value of the property alleged to have been fraudulent transferred as of the time of the alleged transfers, (3) there is no evidence of insolvency at the time of the alleged transfers, and (4) there is insufficient evidence of an actual intent to hinder, delay or defraud creditors. The Court will only address Defendants' first and second contentions as they are dispositive to the issue.

### 1. The Trustee Cannot Establish a Transfer of Property

To determine whether a transfer of GRHC's property occurred, the Court must consider Kansas's fraudulent transfer law. K.S.A. § 33-206(d) provides that "a transfer is not made until the debtor has acquired rights in the asset transferred." K.S.A. § 33-201(b) defines an "asset" as "property of a debtor." Defendants contend that the Trustee cannot establish a transfer of GRHC's property because GRHC never had or acquired the rights in the property that the Trustee contends was fraudulently transferred. The Trustee asserts that GRHC had an interest in the purchase price of the Forward and Lookout Projects. The Trustee puts forth three theories in an attempt to demonstrate that GRHC held a legal interest in these two projects.

### a. The MOU did not vest GRHC with an interest in the purchase price of the Forward and Lookout Projects

The Trustee's first theory is based upon the July 18, 2005, MOU between GRHC and Edison, which states that GRHC is the developer of three windpower projects (Stonycreek, Forward, and Lookout). The Trustee claims that the MOU is a binding agreement and gives

GRHC the right to be paid the purchase price of the Forward and Lookout Projects. The Trustee relies upon several provisions in the MOU, including one that provides that "[t]he Definitive Agreements shall reflect the terms of this Memorandum and shall otherwise be in form and substance acceptable to [Edison] and Developer." Another clause states that the MOU "shall be construed under, governed by, and enforced in accordance with the laws of the State of California."[78]

The Trustee relies upon a Tenth Circuit case, *Parks v. Dittmar (In re Dittmar)*,[79] for support that the MOU was sufficiently certain to create GRHC's interest in the right to be paid the purchase price. The Trustee previously made this argument to the Court.[80] And as this Court previously determined, *Parks* is inapplicable to the facts of this case.[81]

Furthermore, the Court finds that the MOU is merely an agreement to agree. The MOU does not contain all the material terms and conditions that were to be set forth in the definitive agreements. Indeed, the MOU specifically states "[t]his Memorandum is intended as an outline only and does not address all of the terms, conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation referenced herein." It also provides that it "does not commit either Party to enter into the Definitive Agreements or to develop the Projects and the obligations of the Parties are subject to, among other things, the

---

[78] Although the Trustee contends that this provision demonstrates that the MOU is an enforceable, binding agreement, the Trustee never addresses that this provision states that the document should be enforced under California law.

[79] 618 F.3d 1199 (10th Cir. 2010).

[80] The Trustee made this argument in his Response to Defendants' Motion to Declare Judgment Funds are Not Estate Property and to Disburse those Funds.

[81] *See* Doc. 217, pp. 18-19 (noting that a MOU and a collective bargaining agreement are vastly different documents and that because the definitive documents in this case were all executed prior to GRHC's bankruptcy, rather than some documents executed post-bankruptcy, distinguished the facts from the *Parks* case).

matters set forth under the heading 'Conditions Precedent' below."  One of those "Conditions Precedent" was the "[p]reparation and due execution and delivery of definitive and mutually satisfactory legal documentation for the Transaction, including an Acquisition Agreement, Development Agreement, and Development Expense Loan acceptable to each of the Parties."  Furthermore, the MOU states that "[u]pon termination of this Memorandum, neither party shall have any further obligations to the other party under this Memorandum."  Thus, the MOU does not require Edison to enter into definitive agreements with GRHC nor give GRHC the right to the Forward and Lookout Project's purchase price.

On February 3, 2006, definitive agreements were entered into by GRHC, FWHC, LWHC, and Edison.  The Stonycreek Development Agreement named GRHC as the Developer.  The Forward Development Agreement named FWHC as the Developer, and the Lookout Development Agreement named LWHC as the Developer.  Each agreement contained an integration clause which provided: "The agreement constitutes the entire agreement between the parties relating to the transaction described herein and supersedes any and all prior oral or written understandings, including the Memorandum of Understanding dated as of July 18, 2005."  The Court recognizes that the Trustee contends that these documents transferred the interest away from GRHC in the Forward and Lookout Projects.  But GRHC's alleged interest in the purchase price of the Forward and Lookout projects was not so sufficiently certain in the MOU to override the subsequent documents that stated that the MOU ceased to exist.  Accordingly, the Court cannot find that the MOU created a property interest with GRHC in the purchase price of the Forward and Lookout windpower projects.  Thus, the Trustee cannot establish a legal interest of GRHC's property through the MOU.

### b. Earning an interest does not constitute property of the debtor

Next, the Trustee argues that GRHC earned the interest by identifying, developing, and then negotiating the sale of the projects. The Trustee does not provide the Court with any authority that earning an interest constitutes "property of the debtor." In addition, the Trustee fails to demonstrate to the Court when this interest was allegedly fraudulently transferred away from GRHC. Accordingly, the Trustee's second theory fails.

### c. GRHC's alleged admission that it was the developer of the Forward and Lookout Projects does not constitute a property interest

Finally, the Trustee asserts that the individual Defendants represented and admitted that GRHC was the developer of the Forward and Lookout Projects. Again, the Trustee does not provide the Court with any authority that admitting to developing a project establishes that these projects were GRHC's "property." Even if GRHC was the developer of the projects, the mere fact that GRHC admitted that it was the developer does not establish a property interest in the purchase price of the Forward and Lookout projects.[82] As noted above, K.S.A. § 33-201(b) defines "asset" as "property of debtor," and K.S.A. §33-206(d) provides that "a transfer is not made until the debtor has acquired rights in the asset transferred." The Trustee fails to direct the Court to evidence that there is a genuine issue of fact as to whether GRHC had acquired rights in the purchase price or established a property interest.

---

[82] It appears as though the Trustee would have to rely on the MOU to demonstrate that GRHC would be entitled to the purchase price of the Forward and Lookout projects. As the Court has previously determined, this document is not sufficiently certain to provide GRHC with a property right in these two projects.

## 2. The Trustee provides no evidence of the value of the property at the time of the transfer

Even if the Trustee could establish a property interest in Forward's and Lookout Project's purchase price, Defendants contend that the Trustee cannot establish the value of that property at the time of the alleged transfer. Defendants direct the Court to several cases requiring that a trustee must demonstrate the value of the specific property as of the date of the transfer.[83] The Fourth Circuit Court of Appeals noted that

> The critical time is when the transfer is "made." Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given. The burden of establishing that the transfer was not made for fair equivalent value on the critical date . . . rested on the Trustee.[84]

The Trustee fails to address Defendants' argument and case law. Instead, he simply states that no test is necessary, and that by comparing the MOU with the definitive documents, it demonstrates that GRHC did not receive any value for transferring its interest in the Forward and Lookout Projects. Comparing the MOU with the definitive documents does not demonstrate anything.

The Trustee provides the Court with one date—February 3, 2006—as to when the alleged fraudulent transfer occurred. And he does not direct the Court to any evidence of the value of the Forward or Lookout project purchase price as of that date. Instead, he claims that the first

---

[83] Although these cases are not from Kansas, they address the Uniform Fraudulent Transfer Act enacted in other states or the fraudulent transfer provision, 11 U.S.C. § 548, of the Bankruptcy Code.

[84] *In re Morris Commc'ns NC., Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) (citing *In re Hulm*, 45 B.R. 523, 526 (Bankr. N.D. 1984)).

installment for the purchase price was on March 28, 2007.[85]  The Court is unclear as to whether

the Trustee is relying upon the first installment as an attempt to establish value for the purchase

price.  To the extent that the Trustee is doing so, his attempt fails because it is not as of the date

of the alleged fraudulent transfer—February 3, 2006.  The Trustee simply does not provide

evidence that there was value in the alleged property on the critical date.

In sum, the Trustee does not direct the Court to any evidence indicating that GRHC had a

property interest in the purchase price of the Forward and Lookout Projects or to any evidence of

the value of those Projects on the date of the alleged fraudulent transfer.  Accordingly,

Defendants are entitled to summary judgment on the Trustee's fraudulent transfer claims.

### 2.  Breach of Fiduciary Duty Claim

The Trustee alleges that the individual Defendants[86] breached their fiduciary duties to

GRHC.  The majority of the Trustee's breach of fiduciary duty allegations are premised on the

fact that individual Defendants took advantage of the Forward Windpower and Lookout

Windpower opportunities, which usurped these opportunities away from GRHC leaving GRHC

bankrupt with no material assets from which to pay its creditors.  This Court previously

determined that GRHC's Operating Agreement specifically allowed the individual members of

GRHC to take the Forward Windpower and Lookout Windpower opportunities for their own

benefit.[87]  Thus, to the extent that the Trustee's breach of fiduciary duty claims are premised on

---

[85] The Trustee does not state whether this installment relates to the Forward or the Lookout Project.  Presumably, however, the Trustee is referencing the Lookout Project because he then references that the second installment occurred when the Clerk of the Kansas Bankruptcy Court paid money from its registry to LWHC and FreeStream.

[86] The individual Defendants include the Gardners, Stevens, and Ansells.  Most, if not all, of the Trustee's allegations only relate to Mr. Gardner, Mr. Stevens, and Mr. Ansell.  There are no specific facts set forth as to their wives' involvement.

[87] See Doc. 217, pp. 34-38.

these facts, the Trustee's claims fail. To the extent that the Trustee bases his breach of fiduciary duty claim on other facts, the Court will address these contentions.

### a. Choice of Law

As an initial matter, Defendants contend that the Court must determine whether Kansas or Delaware law applies to the remainder of the Trustee's breach of fiduciary duty claim. The Trustee argues that the Court previously decided that Kansas law controls. The Court previously considered the issue when deciding whether a contractual provision in GRHC's Operating Agreement allowed the individual Defendants to take other opportunities for themselves—and whether the taking of these opportunities demonstrated that the individual Defendants breached a fiduciary duty to GRHC. In making that decision, the Court looked to Kansas law because the Court was considering a contractual provision in GRHC's Operating Agreement, and the Operating Agreement provided that it was governed by Kansas law.

The remainder of the Trustee's claim relies on the duties and relationships defined in corporate law, and there are no provisions in GRHC's Operating Agreement expanding or restricting those duties requiring the interpretation of the Operating Agreement and Kansas law. In Kansas, "[t]he generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to . . . the rights and liabilities of its officers, stockholders, and directors."[88] Thus, because GRHC is a Delaware corporation, the Court will apply Delaware law when adjudicating the remainder of the Trustee's breach of fiduciary duty claim.[89] The Court

---

[88] *Consol. Beef Indus., Inc. v. Schuyler*, 233 Kan. 38, 40, 716 P.2d 544, 547 (Kan. 1986).

[89] *See Waddell & Reed, Fin., Inc. v. Torchmark Corp.*, 337 F. Supp. 2d 1243, 1250 (D. Kan. 2004) ("Because Torchmark and W & R Financial are Delaware corporations, the Court applies Delaware law.").

notes, however, that the choice of law issue is largely irrelevant as Kansas and Delaware law are similar.[90]

### b. Breach of Fiduciary Duty Law

Officers and directors of a corporation owe a fiduciary duty to the corporation. Generally, a breach of fiduciary duty is categorized as either a breach of the duty of care or a breach of the duty of loyalty. The parties do not disagree that the individual Defendants owed a fiduciary duty to GRHC. The parties disagree as to whether the individual Defendants breached any fiduciary duty. Defendants assert several arguments as to why the Trustee's breach of fiduciary duty claim should fail. The Court will address each contention.

### 1. The Trustee has Standing

Defendants first raise a standing argument with respect to the Trustee's breach of fiduciary duty claim. Defendants contend that because the Trustee is pursuing damages for the benefit of the creditors, the claims derive from the creditors, and the Trustee must stand in the shoes of the creditors.[91] Under Delaware law, creditors only have standing to pursue breach of fiduciary duty claims upon the insolvency of the entity.[92] Defendants assert that the Trustee cannot prove that GRHC was insolvent at the time of the alleged breach of fiduciary duty and therefore does not have standing to bring a fiduciary duty claim.

---

[90] The Court noted in its previous Order that the choice of law issue was largely irrelevant as Kansas and Delaware law are similar. *See* Doc. 217, p. 36. *Westar Energy, Inc. v. Wittig*, 44 Kan. App. 2d 182, 189, 235 P.3d 515, 521 (2010) (stating that "Delaware is the wellspring of Kansas corporate law.").

[91] The Court notes that Defendants do not direct the Court to any authority for this proposition.

[92] *See North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007).

The Trustee, however, contends that he is bringing the claim on behalf of GRHC.[93] Indeed, the allegations relate to the duties that the individual Defendants owed GRHC and how Defendants breached those duties. Although recovery would ultimately benefit the creditors, the Court concludes that the Trustee is proceeding on behalf of GRHC with respect to this claim. Thus, the Trustee is not standing in the shoes of the creditors.

Defendants also contend that the fact that the individual Defendants owed fiduciary duties to GRHC does not negate the need for the Trustee to demonstrate insolvency. Yet, Defendants do not direct the Court to any authority for this position. Because Defendants do not provide the Court with any authority for this position, and because the Court concludes that the Trustee is not standing in the shoes of the creditors, the Trustee need not demonstrate insolvency at the time of the alleged breach of fiduciary duty to proceed.

### 2. There are no allegations of a breach of fiduciary duty of care

Directors owe a fiduciary duty to "use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent."[94] Defendants contend that the Trustee does not allege any facts to support a claim for breach of duty of care. With respect to this argument, the Trustee simply states that the Second Amended Complaint alleges numerous

---

[93] In contrast, with respect to the fraudulent transfer claims, the Trustee asserts that he is bringing those claims on behalf of the creditors.

[94] *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 749 (Del. Ch. 2005) (internal quotation marks and citations omitted).

acts that violate the individual Defendants' fiduciary duty of care.[95]  Yet, the Trustee fails to direct the Court to which of these allegations supports a claim for breach of duty of care.  Nor does the Trustee provide or cite to any evidence that indicates a genuine issue of material fact exists as to whether the individual Defendants breached a fiduciary duty of care.  Thus, to the extent that any of these allegations relate to an alleged breach of fiduciary duty of care, the Court grants Defendants summary judgment.

### 3. There are questions of fact as to whether the individual Defendants breached their fiduciary duty of loyalty to GRHC

The fiduciary duty of loyalty requires that "the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder . . . ."[96]  "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. . . . The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest."[97]

There is only one remaining allegation related to the Trustee's breach of fiduciary duty of loyalty claim.  This allegation provides that the individual Defendants "paid themselves large sums of money after they knew of [sic] should of [sic] known that GRHC was insolvent, or would become insolvent if the LW and/or FW projects were stripped from GRHC."[98]

---

[95] The Trustee's arguments are often confusing and difficult to follow.  Although the Trustee cites to numerous cases, they have little to no application to the facts in this case.

[96] *Cede & Co v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[97] *Id.* (citing *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939)).

[98] *See* Doc. 253, Pretrial Order, p. 8, ¶ 6(b)(1)(j).  This allegation only relates to Mr. Ansell, Mr. Gardner, and Mr. Stevens.  There are no allegations that their wives received any salary from GRHC.

Defendants state that the evidence demonstrates that the individual Defendants took the last salary payment from GRHC in February 2004. Defendants assert that months after receiving the last salary payment, they received information as to the Lookout Project. They contend that because the Lookout Project did not exist until after the last salary payment, there is no possibility that the individual Defendants knew that "stripping" the Lookout Project would render GRHC insolvent. Thus, they contend that there is no evidence that they breached their fiduciary duty to GRHC.

Yet, Defendants' argument is incomplete and fails to address the Forward Project and fails to address what impact their salaries may have had on GRHC. The evidence shows that the Forward Project began in 2002—around the same time that the individual Defendants began receiving their salaries from GRHC. The facts demonstrate that the individual Defendants received almost $1 million in compensation from GRHC over three years (2002-2004). In late 2003, the individual Defendants requested that the Foundations extend the maturity date of GRHC's two $1 million loans—one of which was related to the Forward Project.[99] In early 2004, the Foundations extended the maturity dates of their loans while at the same time the individual Defendants paid themselves a salary of $115,000 per person.[100] Ultimately, GRHC went bankrupt and did not have the means to pay the Foundations back for the $1 million Forward loan. The Court concludes that there are questions of fact as to whether the three individual Defendants engaged in self-dealing and breached their fiduciary duty of loyalty to

---

[99] As previously noted, there are numerous questions surrounding the Forward Project.

[100] The Court notes that Defendants also state that they knew that the Forward 1 Project was not viable at this time and abandoned the Forward 1 Project. If the Forward 1 Project was not viable, there are questions as to why GRHC paid the individual Defendants salary and requested an extension of time to repay the $1 million loan related to that particular project.

GRHC with respect to this specific issue. Thus, the Court denies Defendants' Motion for Summary Judgment on this issue.[101]

### 4. The statute of limitations does not bar the Trustee's claim

Defendants also contend that because the Trustee steps into the shoes of the creditors, the breach of fiduciary duty claim is untimely as it was filed more than two years after the creditors knew of the harm in 2003 or 2004.[102] K.S.A. § 60-513(a)(4) requires that an action for injury to the rights of another, and not arising on contract, must be brought within two years. But K.S.A. § 60-513(b) provides

> Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of the injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.

---

[101] The Court also rejects Defendants' statute of limitations argument. Defendants contend that because the Trustee steps into the shoes of the creditors, the breach of fiduciary duty claim is untimely as it was filed more than two years after the creditors knew of the harm in 2003 or 2004. *See* K.S.A. § 60-513(a)(4) (requiring that an action for injury to the rights of another, and not arising on contract, be brought within two years). Because the Court finds that the Trustee is not stepping into the shoes of the creditors, but is instead pursuing the claim on behalf of GRHC, the Court looks to when the injury became reasonably ascertainable to GRHC. *See* K.S.A. § 60-513(b) (stating that "[e]xcept as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of the injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." ). *See also* Doc. 109 (discussing K.S.A. § 60-513(b) and the adverse domination doctrine and its applicability to this case). Arguably, K.S.A. § 60-513(d) may also be applicable. *See* K.S.A. § 60-513(d) (stating that in "[a]ll other causes of action by a corporation or association against an officer or director of the corporation or association shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury and there exists a disinterested majority of nonculpable directors of the corporation or association, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of the injury becomes reasonably ascertainable and there exists a disinterested majority of nonculpable directors of the corporation or association, but in no event shall such an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." ). Thus, the Trustee's breach of fiduciary duty claim is not barred by the statute of limitations.

[102] *See* K.S.A. § 60-513(a)(4) (requiring that an action for injury to the rights of another, and not arising on contract, be brought within two years).

Because the Court finds that the Trustee is not stepping into the shoes of the creditors, but is instead pursuing the claim on behalf of GRHC, the Court looks to when the injury became reasonably ascertainable to GRHC—which is when a disinterested majority of non-culpable directors existed.[103] The injury became reasonably ascertainable to GRHC when GRHC filed for bankruptcy and the Trustee was appointed to GRHC's bankruptcy estate. Thus, the Trustee's breach of fiduciary duty claim is not barred by the statute of limitations.

### 3. Conspiracy Claim

Defendants contend that because the Trustee's breach of fiduciary duty claim fails, his conspiracy claim must fail because it is not based on a valid underlying tort. In addition, Defendants argue that the Trustee cannot meet the prima facie requirements of a civil conspiracy claim. The Trustee fails to address Defendants' second argument and instead simply asserts that because his breach of fiduciary duty claim remains viable, the claim for conspiracy also remains viable. The Court disagrees.

To demonstrate a civil conspiracy, the Trustee must show "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or the course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."[104] Individuals

---

[103] *See also* Doc. 109 (discussing K.S.A. § 60-513(b) and the adverse domination doctrine and its applicability to this case). Arguably, K.S.A. § 60-513(d) may also be applicable. *See* K.S.A. § 60-513(d) (stating that in "[a]ll other causes of action by a corporation or association against an officer or director of the corporation or association shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury and there exists a disinterested majority of nonculpable directors of the corporation or association, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of the injury becomes reasonably ascertainable and there exists a disinterested majority of nonculpable directors of the corporation or association, but in no event shall such an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." ).

[104] *Meyer Land & Cattle Co. v. Lincoln County Conservation District*, 29 Kan. App. 2d 746, 753, 31 P.3d 970, 976 (2001).

acting in their corporate capacities cannot conspire with themselves because their conduct is attributable to the entity which they represent.[105]  In this case, the Trustee does not address Defendants' argument that he did not allege that the individual Defendants were acting outside their official capacities with GRHC.  Thus, the individual Defendants' actions would be attributable to GRHC, and GRHC cannot conspire with itself.  Accordingly, the Trustee's conspiracy claim fails, and Defendants are entitled to summary judgment on this claim.

### 4. Conclusion as to Defendants' Motions

In sum, the Court grants Defendants' Motion for Summary Judgment as to the fraudulent transfer claims and conspiracy claim.  The Court grants in part and denies in part Defendant's Motion for Summary Judgment on the breach of fiduciary duty claim.  Only a small portion of that claim remains.  The only portion remaining is the Trustee's alleged breach of fiduciary duty of loyalty with respect to the individual Defendants' salary payments, and this claim only relates to Mr. Ansell, Mr. Stevens, and Mr. Gardner.   Finally, the Court denies Defendant's request for oral argument on their motion because the Court finds that the motion was fully briefed and oral argument is unnecessary.

### B.  Plaintiff's Motion for Partial Summary Judgment (Doc. 256)

Plaintiff moves for partial summary judgment on and under 11 U.S.C. § 544 (Doc. 256) asserting that the Court should avoid the transfer of GRHC's alleged interest in the Forward Project and Lookout Project and require Defendants to disgorge and return the Forward and Lookout Project's purchase price for a fair distribution under the Bankruptcy Code.

---

[105] *Diederich v. Yarnevich*, 40 Kan. App. 2d 801, 811, 196 P.3d 411, 419 (Kan. App. 2008) ("It is difficult to see how a corporate director or officer can be liable for conspiring with other directors and officers to do something on behalf of the corporation those directors and officers are representing.").

The Trustee's motion for partial summary judgment and memorandum in support of the motion are deficient in numerous ways. First and foremost, the Trustee contends in his motion that he is proceeding under 11 U.S.C. §§ 541, 544, 548, and 550.[106] In his memorandum, he moves for summary judgment under 11 U.S.C. § 544. As noted above, the Trustee never asserted § 544 in his Complaint. Nor did the Trustee plead an avoidance action under § 548 or recovery under § 550 of the Bankruptcy Code.[107] The Trustee asserted fraudulent transfer causes of action under the KUFTA. Thus, he must proceed under the KUFTA.[108]

Furthermore, summary judgment is only appropriate if there are no genuine issues of material fact. The Trustee fails to adequately support the majority of the facts that he set forth. The Trustee also fails to demonstrate how the alleged facts relate to fraudulent transfer law under KUFTA. Thus, he does not present uncontroverted evidence demonstrating that he is entitled to summary judgment. Accordingly, the Court denies the Trustee's Motion for Partial Summary Judgment.

### III. Plaintiff's Motion to Enforce Rule 26(e) (Doc. 274)

The Trustee also has a Motion to Enforce Rule 26(e). In previous interrogatories, the Trustee requested that the individual Defendants identify the amount of money they had received

---

[106] The Trustee, however, fails to specifically discuss, or provide any argument, as to three of these provisions (§§ 541, 548, and 550) in his memorandum.

[107] The Trustee contends that this Court previously found that the Trustee plausibly stated a cause of action for fraudulent transfer. Although the Court did previously make this finding, the Court did so in the context of a state fraudulent transfer claim (under KUFTA). As the Court specifically noted, "The Trustee's fraudulent transfer claims are brought pursuant to the Kansas Uniform Fraudulent Transfer Act, and they are not brought pursuant to the Bankruptcy Code. Neither party discusses the distinction." *See* Doc. 217, p. 31, n. 93.
In addition, the Court never previously discussed whether the Trustee adequately pled recovery under § 550 as the Court was never asked to interpret or apply this statute. Nor was the Court aware that the Trustee intended to rely upon this statute because the Trustee only referenced Kansas state law.

[108] The Trustee only sparingly references KUFTA in his memorandum, but addresses it more fully in his reply.

from wind farm sales. The Trustee argues that Defendants should supplement their interrogatory response because of the Clerk of the Bankruptcy Court's distribution of 75% of $8,941,448.46 to LWHC on May 8, 2012. The Trustee states that he seeks this information because Defendants claim in their motion for summary judgment that "there is no proof the investment companies received any money from LWHC (i.e., are not 'mediate transferees' under 11 U.S.C. § 550)."[109] Thus, it appears that the Trustee seeks this information in relation to his fraudulent transfer claim. Because the Court granted Defendants' motion for summary judgment on the Trustee's fraudulent transfer claim, and because the information that the Trustee seeks is irrelevant to his fraudulent transfer claim, the Court denies the Trustee's motion as moot.

**IT IS ACCORDINGLY ORDERED** this 3rd day of July, 2013, that Defendants' Motion for Summary Judgment (Doc. 255) is hereby **GRANTED IN PART and DENIED IN PART**. The Trustee's only remaining claim is his breach of fiduciary duty claim on the basis that the individual Defendants breached their fiduciary duty of loyalty to GRHC by paying themselves large sums of money when they knew or should have known that GRHC was or would become insolvent. Furthermore, this claim only remains with respect to Mssrs. Ansell, Gardner, and Stevens.

---

[109] As noted above, the Trustee never pled 11 U.S.C. § 550, and it is inapplicable in this case.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 256) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Enforce Rule 26(e) (Doc. 274) is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE